UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NO. 1:24-CR-50-HAB-ALT |
| ANTONIO KELLY | |

## OPINION AND ORDER

The Government charged Defendant Antonio Kelly ("Kelly") with being a felon in possession of a firearm and possessing an unregistered firearm.[1] (ECF 1). Kelly has moved to suppress the shotgun at the center of both charges arguing that officers lacked reasonable suspicion to stop him, that the search of the backpack where the firearm was found was unlawful, and that his arrest was not supported by probable cause. (ECF 28).

The Court held an evidentiary hearing on the motion on July 24, 2025. (ECF 37). The matter has since been fully briefed. (ECF 40, 41, 42). Because the Court finds that the officers had probable cause to arrest Kelly before searching the backpack, making the search incident to a lawful arrest, the Court will DENY the motion.

## BACKGROUND

At the evidentiary hearing, the Government presented testimony from Fort Wayne Police Officers Noah Dorsch ("Officer Dorsch"), Jessica Blattner ("Officer Blattner"), and Shay Beaver ("Officer Beaver"), as well as Sergeant Phillip Ealing ("Sgt. Ealing"). (ECF 37, "Hrg. Tr."). They testified as follows: On October 13, 2024, FWPD received two reports of shots fired at the same

---

[1] These two counts charge violations of 18 U.S.C. § 922(g)(1), 26 U.S.C. § 5841, and 26 U.S.C. § 5861(d).

gas station less than three hours apart. The first happened at around 6:25 p.m. (Hrg. Ex. 2).[2] Officer Dorsch arrived on scene within one minute of the dispatch. (*Id.* at 2). The parties to the incident had left by the time Officer Dorsch arrived. Still, Officer Dorsch got to view surveillance video of the incident while he was at the gas station. (Hrg. Tr., at 10). Officer Dorsch testified that the video showcased a black male in black clothing fighting with two other individuals over a gray backpack. (*Id.*). He did not see a gun in the video. (*Id.* at 13). Having found nothing to substantiate the shots fired report, he left the gas station and ended his investigation for the time being. (*Id.* at 50).

Between this first shots fired report and the one to come, Officer Dorsch read the dispatch comments. (*Id.* at 11, 14). The caller who reported the incident said that the shooter was a black male with a gray beard wearing a black shirt, black pants, and a black and white ball cap. (*Id.* at 12). The man allegedly got into a physical altercation, went inside the gas station, then came out with a shotgun and fired it into the air twice. (*Id.*).

The second report came in at 9:04 p.m. At that time, Officer Dorsch was parked in an alley directly around the corner from the gas station. (*Id.* at 13–14). Officer Blattner, Officer Beaver, and Sgt. Ealing were also there. (*Id.* at 57–58, 85, 104). Many of them heard the reported gunshot, which they believed sounded like a shotgun blast (*Id.* at 59–60, 105).

Officer Dorsch was again the first officer on scene. (*Id.* at 20; Hrg. Ex. A). He thought of the 6:25 p.m. call and the dispatch comments as he approached. (Hrg. Tr., at 15). When Officer Dorsch turned the corner and approached the gas station, he saw a man who seemed to match the description from the earlier call leaving the station lot on foot. (Hrg. Tr. at 15–16; Hrg. Ex. A, at 0:45–1:15). The man was black, had a gray beard, and was wearing black pants and a black and white ball cap. (Hrg. Ex. A, at 0:45–1:15). He was wearing a black sweatshirt, so his shirt color

---

[2] All exhibits are referenced by how they were marked when admitted at the suppression hearing. (ECF 37).

2

could not be discerned. (*Id.*). But he was holding a gray backpack like the one he had seen in the surveillance video. (*Id.*). Officer Dorsch activated his car's emergency lights to get the man to stop. (*Id.* at 0:45). He eventually stopped his car next to the man—later identified as Kelly—and exited to detain him. (*Id.* at 1:15). Kelly dropped the backpack when Officer Dorsch moved to put his hands behind his back. (*Id.* at 1:20).

Officer Blattner arrived next, just after Officer Dorsch. (*Id.*). She testified that as she drove by the gas station, an employee came out to the parking lot and pointed to Kelly. (Hrg. Tr., at 64–65). Dash camera footage and officer testimony both indicate there was very little foot traffic beyond Kelly near the gas station at that time. (Hrg. Tr., at 65; Hrg. Ex. A, at 0:41–1:10; Hrg. Ex. 6, at 0:52–1:18). Officer Blattner pulled up right as Officer Dorsch placed Kelly's hands behind his back and into handcuffs. (Hrg. Ex. A, at 1:20). Officer Blattner testified that as she got out of her car, she heard dispatch air that there was a black male in a black t-shirt that shot in the air. (Hrg. Tr., at 66; Hrg. Ex. A, at 1:22–1:29). Officer Dorsch could hear dispatch at this point, but he was not listening. (Hrg. Tr., at 19). Officer Dorsch added that he was not sure yet if Kelly was responsible for either shooting. (Hrg. Ex. A, at 1:42–1:49). But Officer Blattner, who did hear dispatch's description, had already told dispatch that they "got him." (*Id.* at 1:33). At that moment, Officer Beaver arrived. (*Id.* at 1:45). Officer Blattner then told Officer Beaver to "check that," referring to the backpack. (Hrg. Tr., at 22–23, 68). The search of the backpack then yielded the shotgun. (*Id.* at 87).

## **LEGAL STANDARD**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches are *per se* unreasonable under the Fourth Amendment unless

3

one of few recognized exceptions applies." *United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015). Only two exceptions are relevant here.

The first is an investigatory stop under *Terry v. Ohio*. 392 U.S. 1. "Stopping someone is generally considered a seizure and ordinarily requires probable cause to be reasonable." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). But in a *Terry* stop, police "may briefly detain a suspect to verify or dispel" a "reasonable suspicion that the suspect may be engaged in criminal activity." *Moderson v. City of Neenah*, 137 F.4th 611, 615 (7th Cir. 2025). "Reasonable suspicion requires 'more than a hunch but less than probable cause.'" *United States v. Street*, 917 F.3d 586, 593 (7th Cir. 2019). In other words, reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigative stop. *Terry*, 392 U.S. at 21.

To determine whether police had reasonable suspicion to initiate a *Terry* stop, courts look to "the totality of the circumstances known to the officer at the time of the stop." *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996). This includes "the experience of the officer and the behavior and characteristics of the suspect." *United States v, Riley*, 493 F.3d 803, 808 (7th Cir. 2007). When multiple officers are communicating about a suspect, "the knowledge of one officer can be imputed to the other officers." *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000).

The second relevant exception is a search incident to a lawful arrest. This categorically allows police to search physical containers "immediately associated with the person of the arrestee" at the time of the arrest. *Riley v. California*, 573 U.S. 373, 384–86 (2014); *Leo*, 792 F.3d at 748. Arresting officers need not even "suspect that the container holds a weapon or contraband" for such a search to be lawful. *United States v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012). That is, if the officers have probable cause, which requires police, "under the totality of the

4

circumstances, to reasonably believe that a particular individual has committed a crime." *United States v. Gilbert*, 45 F.3d 1163, 1166 (7th Cir. 1995); *Illinois v. Gates*, 462 U.S. 214, 244 n. 13 (1983) ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity").

## DISCUSSION

### I. Officers Had Reasonable Suspicion

Kelly argues that the FWPD officers lacked reasonable suspicion to conduct a *Terry* stop. He further asserts that even if the officers had reasonable suspicion, they never developed probable cause. So they would have needed a warrant to lawfully search the backpack. The Government counters that the officers had reasonable suspicion to stop Kelly. And when Officer Blattner arrived on the scene with the description of the 9:04 shooter, police had probable cause to arrest Kelly and search the backpack. The Court agrees with the government.

The officers heard the 9:04 gunshot go off from right around the corner. They arrived on scene within one minute. Officer Dorsch, who got there first, had investigated the 6:25 report of shots fired at the same gas station. He had seen the footage of a man who got into a fight and reportedly fired gunshots into the air. He also read the dispatch comments that described him in more detail. When he arrived at the gas station, he saw Kelly walking away. Kelly matched the description from the 6:25 report almost perfectly. He was a black male with a gray beard wearing dark clothes and a black and white ball cap. And he was carrying a gray backpack like the one Officer Dorsch had seen in the earlier surveillance video. Given that both reports happened in the same place, Kelly's resemblance to the 6:25 suspect, and Officer Dorsch's knowledge at the time, there were ample specific and articulable facts justifying reasonable suspicion that Kelly had committed a crime. Thus, the officers lawfully stopped Kelly.

5

## II. Warrantless Search Not Justified Under *Terry*

The next question is whether the officers lawfully searched the backpack. This one is a closer call. Kelly points to the Seventh Circuit's decision in *United States v. Leo*, 792 F.3d 742 (7th Cir. 2015), to argue that the officers' search of the backpack was unlawful. Kelly is correct, but only partially. In *Leo*, an officer had spotted two men running into a building near a duplex. *Id.* at 744. He recognized one of the men, Enrique Aranda, as a felon. *Id.* He did not recognize the other man, Robert Leo. *Id.* As that occurred, dispatch reported a 911 call of a burglary in that duplex. *Id.* The caller said that one of the men had changed into a red jacket, and Leo was wearing one. *Id.* The caller also mentioned that a gun used in the burglary had been stuffed into a backpack, and Leo was carrying a backpack. *Id.*

Later, the officer spotted the two men approaching a preschool and ordered them to stop. *Id.* at 744–45. Another officer arrived to help. *Id.* at 745. Aranda complied and stopped. *Id.* Leo ran but was promptly caught and handcuffed. *Id.* By this time, a different officer located the caller and confirmed that Aranda and Leo were the men who purportedly tried to break into the duplex. *Id.* The officers frisked both men and found nothing. *Id.* Then, without asking Leo any questions, one officer emptied the backpack that he had taken from Leo. *Id.* That search turned up a loaded revolver. *Id.* After this discovery, the officers learned that the caller was mistaken and no burglary occurred. *Id.* But by then, the officers had discovered that Leo was a felon on probation, so he was arrested for being a felon in possession. *Id.*

Although the district court denied Leo's motion to suppress, the Seventh Circuit reversed. *Id.* at 744, 746–47. The only question was "whether the police lawfully searched Leo's backpack based only on reasonable suspicion" during a *Terry* stop. *Id.* at 749. The Seventh Circuit held that they could not. *Id.* The officers lawfully patted Leo down and they could have patted down the

backpack itself. *Id.* But the officer with Leo burrowed into his backpack immediately, before even learning who he was. *Id.* at 751. Had the officer learned of Leo's felon status before searching the backpack, the case likely would have been different. *See id.* Yet the officer instead chose to dive right in, and the Court concluded that this exceeded the scope of a lawful *Terry* stop.

Here, Officer Dorsch detained Kelly based on reasonable suspicion. Within less than one minute, the other FWPD officers arrived and began searching his backpack. This bears a striking factual resemblance to *Leo*. Both there and here, officers quickly rummaged through the backpack of a detainee without a warrant when the stop was based on reasonable suspicion. The Seventh Circuit determined that such a search exceeded the scope of a *Terry* stop. Here, then, the FWPD officers could not have lawfully searched Kelly's backpack based on reasonable suspicion alone. They needed probable cause to arrest him.

### III.     Officers Conducted Lawful Search Incident to Arrest

But *Leo* did not address probable cause. In fact, the government there never argued that the officers had probable cause. *Id.* at 748. The Seventh Circuit deemed the argument waived and explicitly refused to address whether the search may have, for example, been incident to a lawful arrest. *Id.* at 748–49. So while *Leo* precludes the search of Kelly's backpack from being lawful based solely on reasonable suspicion, the search was still lawful if it was supported by probable cause. And it was.

Officer Dorsch had reasonable suspicion when he detained Kelly, not probable cause. Kelly argues that nothing changed between this moment and the discovery of the shotgun to develop the reasonable suspicion into probable cause. But when Officer Blattner arrived seconds later, she came armed with more information. She saw the gas station employee come out and point to Kelly as he was walking away. Plus, once Officer Blattner pulled up next to Dorsch as he was detaining

7

Kelly, she heard dispatch describe the 9:04 shooter as a black male in a black t-shirt. At this moment, Kelly was wearing a black sweatshirt.

Kelly contends that this distinction defeats probable cause because a t-shirt cannot be confused with a sweatshirt, and the difference means he did not match the description. T-shirts and sweatshirts are distinct. None of the videos provided to the Court show whether Kelly was wearing a black t-shirt underneath the sweatshirt. But this detail does not defeat probable cause. For one thing, most people can put on a sweatshirt in seconds, rendering the distinction immaterial. For another, there could have been a communications mix up as to whether it was a t-shirt or a sweatshirt. Either way, the pieces add up to probable cause here.

The Court looks at "the totality of the circumstances" to assess whether probable cause exists. *Gilbert*, 45 F.3d at 1166. The knowledge of all officers present at the time of arrest can be considered. *Sawyer*, 224 F.3d at 680. Combine the 9:04 dispatch description, the employee pointing at Kelly, the prompt arrival of officers to the scene, the lack of foot traffic beyond Kelly, Officer Dorsch's knowledge of the 6:25 incident, and the close match between Kelly at 9:04 and the described perpetrator of 6:25 incident. Taken together, they enabled the FWPD officers to reasonably believe that Kelly had committed a crime. They had probable cause to arrest him, and in turn the lawful authority to search his gray backpack which was associated with him at the time of the stop. Kelly makes no argument that this exceeds the scope of a search incident to arrest.

## CONCLUSION

Kelly's Motion to Suppress (ECF 28) is DENIED. A scheduling order will be issued by separate entry.

**SO ORDERED** on December 9, 2025.

                                          s/ *Holly A. Brady*
                                          CHIEF JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT COURT